**D. P. PAUL & CO., Inc., v. MELLON, Secretary of the Treasury, et al.**

District Court, S. D. New York. January 16, 1928.

1. Evidence ⊂⊃158(26)—Permittee's record of products manufactured from liquors withdrawn is best evidence of its incompleteness.

The best evidence of what permittee's manufacturing record did not show as to amounts of products manufactured from intoxicating liquor withdrawn under permit is the record itself, not testimony of prohibition agents inspecting plant.

2. Intoxicating liquors ⊂⊃108(10)—Incompleteness of record showing amounts of products manufactured from liquor withdrawn, in dozens of bottles, instead of gallons, held not to justify revocation of permit.

That permittee's manufacturing record, correctly showing amounts of products manufactured from intoxicating liquors withdrawn under permit, but in dozens of bottles, instead of gallons or other standard units of measure, was incomplete, without explanation that 16 ounces were counted as one bottle, regardless of size, did not justify revocation of permit, in absence of bad faith or improper motive.

3. Witnesses ⊂⊃37(1)—Testimony as to how chemist calculated quantities of products manufactured from liquors withdrawn should have been disregarded, where witness admitted lack of knowledge on cross-examination.

In suit to review order revoking permit to use intoxicating liquors in manufacture of certain products, direct testimony of agent inspecting plant that chemist calculated from required formulæ quantities of finished product, which should have been produced with amounts of liquor shown to have been used by manufacturing record, should have been disregarded, where he admitted on cross-examination that he knew nothing of method of computation and was not in room when made.

4. Intoxicating liquors ⊂⊃108(5)—Revocation of permit to withdraw whisky, used in filling foreign orders on ground that application was based on showing of domestic demand, held not justified by evidence.

Revocation of permit to withdraw additional 400 gallons of whisky per quarter for use in manufacturing certain products *held* not justified, on ground that application to allow withdrawal of 1,138 gallons was based solely on attempted showing of domestic demand, while increased allowance was used in filling foreign orders, where application was based on substantial foreign orders and Treasury Department clearly intended that allowance should be so used.

5. Intoxicating liquors ⊂⊃108(5)—Letter referring to "firm standing orders," and affidavits not showing that they were consignment orders, held not to authorize revocation of permits to withdraw whisky.

That letter from permittee's lawyer referred to "firm standing orders," and affidavit and annexed copies of confirmations of orders did not disclose on their face that orders were consignment orders, *held* not to authorize revo-

cation of withdrawal permit on ground of fraudulent misrepresentations that permittee had firm standing orders from domestic druggists for manufactured products, necessitating use of quantity of whisky sought to be withdrawn, where administrative officers were fully informed that they were consignment orders.

6. **Intoxicating liquors ⬦=➔106(2)—Inability to account for bills of lading for export shipments covered by canceled invoices on file held not to authorize revocation of permit to withdraw whisky.**

That permittee could not tell prohibition agents what became of missing bills of lading for some export shipments, purported to be covered by canceled invoices in permittee's office files and not made according to custom house records, *held* not to authorize revocation of withdrawal permit, in absence of evidence that total sales covered by all invoices were checked against permittee's other records or reports to Treasury Department or that canceled invoices were used to account for disposition of manufactured products.

7. **Intoxicating liquors ⬦=➔108(10)—Prohibition administrator's findings as to witnesses' credibility should not be disturbed, in suit to review order revoking withdrawal permit.**

In suit to review prohibition administrator's order revoking permit to use spirits, wine, and specially denatured alcohol in manufacture of certain products, findings as to credibility of witnesses at administrative hearing should not be disturbed.

8. **Intoxicating liquors ⬦=➔106(2)—Mere absence of papers from files, or of notations of cancellation on every invoice is not ground for revoking permit to withdraw whisky for manufacturing purposes.**

It is not ground for revoking permit to withdraw whisky for use in manufactured products that papers are not found in their proper files, nor notations made on every invoice that transaction has been canceled; but, to sustain charge of fraudulent misrepresentation in accounting for disposition of products, evidence must show that canceled invoices were intentionally placed in files to create false impression, or that transactions were recorded as completed sales.

9. **Intoxicating liquors ⬦=➔108(5)—Prohibition agent's testimony, contradicted by permittee's manufacturing records, held not to justify revocation of alcohol withdrawal permit.**

Prohibition agent's testimony, contradicted by permittee's manufacturing records, as to quantities of manufactured products and alcohol used therein, *held* not to authorize revocation of withdrawal permit on ground of illegal manufacture of intoxicating liquor for beverage use without reporting it, and diversion of alcohol reported as used in manufacture of such products.

10. **Intoxicating liquors ⬦=➔106(4)—Belief that purchasers were diverting denatured alcohol in products sold held not to warrant revocation of seller's withdrawal permit.**

That three companies, to which products manufactured by permittee were sold, were believed to be engaged in diversion of denatured alcohol for beverage purposes, *held* not to authorize revocation of withdrawal permit, where there was no evidence that permittee was aware of such diversion, and it terminated all transactions with such companies when notified that Treasury Department doubted their honesty.

11. **Officers ⬦=➔103—Administrative tribunals can determine facts only on formally presented evidence incorporated in record.**

Administrative tribunals have broad powers in rendering decisions vitally affecting individual rights, but are authorized to determine facts only on evidence formally presented and incorporated in record of their proceedings.

In Equity. Suit by D. P. Paul & Co., Inc., against Andrew W. Mellon, Secretary of the Treasury, and others, to review an order revoking plaintiff's permit to use spirits, wine, and specially denatured alcohol in manufacture of certain products. Decree reinstating permit directed.

Thomas & Friedman, of New York City (C. D. Williams, of New York City, of counsel), for plaintiff.

Charles H. Tuttle, U. S. Atty., of New York City (Ulysses S. Grant, Asst. U. S. Atty., of New York City, of counsel), for defendants.

THACHER, District Judge. Plaintiff's permit has been revoked upon six grounds, and it will be necessary to consider each of them.

[1, 2] The first ground is stated as follows:

"(1) That the respondent's manufacturing records failed to show the amounts of finished products manufactured from intoxicating liquor withdrawn under permit."

The best evidence of what the plaintiff's manufacturing record did not show is the record itself, which is criticized only because manufactured products are shown in dozens of bottles, and not in gallons or other standard units of measure. The charge deals with incompleteness, not with inaccuracy, in the record. In making the entries, 16 ounces of product was counted as one bottle, regardless of the size of the bottle in which the product was actually put up. During the inspection of the plant the agents complained that the amount of product manufactured should have been shown in gallons, and requested that the items shown in dozens of bottles be carried out in gallons. This was simple enough, because the unit in fact used in making the record was a dozen pints, equivalent to 6 quarts, or 1½ gallons. Accordingly the chemist multiplied the number of dozen bottles shown in each entry by 1.5,

and thus set down the amount in gallons as requested. The regulation (section 174, Regulations 60) requires that a record be kept showing the "number of gallons or amount, however expressed, of each product manufactured." It may be that without explanation the record was incomplete, but this informality could not justify revocation, in the absence of bad faith. The correctness of the record is not questioned, nor is there evidence of any improper motive in the method of keeping it.

[3] I am not unmindful of the fact that one of the agents who made the inspection testified on direct examination that the chemist made the extensions by calculating from the required formulæ the quantities of finished product which should have been produced with the amounts of intoxicating liquor shown by the record to have been used. On his cross-examination he admitted, however, that he did not know anything about how the computations were made, and was not in the room when they were made. When confronted with his testimony on direct examination, he repeated that "he" (referring to the chemist who made the extensions) was out in the back room. The witness would not say that any of the calculations were made in his presence, although he added that perhaps one or two might have been. Thus his testimony as to the basis of computation was utterly destroyed by his cross-examination, and should have been disregarded.

The method of computation is shown with mathematical certainty by the record, which speaks for itself. It appears therefrom that the computation was carried out to two decimals in 115 separate items, each of which, with but one exception, is correctly computed by multiplying the number of dozen bottles by 1.5, and setting down the result as the quantity of manufactured product in gallons. Notwithstanding this state of the record, the administrative officers accepted as true the testimony of the agent given upon his direct examination, and utterly disregarded these computations. This is apparent from the decision of the Board of Review, which states and relies upon the testimony given upon the agent's direct examination in support of this charge. The conclusion there reached, and the facts there found, not only find no support in the evidence appearing upon the record, but are affirmatively shown to be unfounded in fact.

[4] The second ground upon which the permit was revoked is stated as follows:

"(2) That on June 30, 1926, respondent was granted a permit to increase his withdrawal allowance of whisky from 200 gallons per quarter to 600 gallons per quarter upon misrepresentations, false statements, and agreements made knowingly by the respondent to the prohibition administrator, particularly as to orders which the respondent represented to the administrator at that time as being actual firm orders, whereas in truth the products to be shipped by respondent were to be so shipped on consignment orders."

The application was to allow the withdrawal of 1,138 additional wine gallons of whisky per quarter, and it was allowed to the extent of 400 gallons only. The conclusion reached at the hearing was that invoices were submitted in support of the application, purporting to show orders from prospective customers, some of which, upon investigation, could not be confirmed, and some of which were merely consignment orders, under which no obligation to pay for the goods arose until they were sold by the consignee, who merely consented to receive them and sell them, if possible. These orders were thoroughly investigated, and their character known, when the partial allowance was granted upon the plaintiff's application. The trial officer concluded that "the question of good faith" was probably waived by this action of the department, but proceeded to sustain the charge upon a finding of fact that the application was based solely upon an attempted showing of domestic demand, whereas the increased allowance was used in filling foreign orders.

The conclusion finds no support in the evidence, because the application was based upon very substantial foreign orders, and it seems entirely clear that the department intended that the increased allowance should be used as it was used. Certainly the permittee could not be expected to supply the demand for 1,138 gallons with an allowance of 400 gallons, and yet in effect the conclusion at the administrative hearing was that its permit should be revoked in toto because this was not done.

[5] In reviewing the action of the trial officer, the Board of Review attempted to support this charge upon other grounds, and held the evidence conclusive to the point "that the respondent company did not have, and has not since had, a firm standing order from any domestic druggist, and that the affidavits, statements, and agreement between the respondent and the government, upon which the increase was allowed June 30, 1926, were misrepresentations knowingly made by the respondent." Reference is

made to a letter written by the defendant's attorney under date of June 14, 1926, in which the permittee's orders are referred to as "firm standing orders," which "accurately reflect the approximate quantity of spirit fermenti necessary to fill the same." At the time when this statement was made it had been fully disclosed to the administrative officers that the orders in question were consignment orders. This is entirely clear from the report of Agents Donnelly and Murtha, dated May 21, 1926, which contained the following statement:

"The permit under which the medicinal preparations are now manufactured allows the withdrawal of 200 W. G. of whisky per quarterly period, which they contend is insufficient for their needs, and in support of this statement produced orders from approximately 75 representative wholesale druggists throughout the United States, requesting consignments of their preparations. * * * A list of the aforementioned druggists and foreign customers is attached to and made a part of this report."

The further investigation which was made of these orders seems to have been directed to the ascertainment of whether they were bona fide consignment orders, and there was never any misunderstanding of the fact that they were not firm contracts of sale. The lawyer's letter may have been technically inaccurate, but it was certainly not misleading, much less fraudulent. Nor do I find in the affidavits submitted in support of the application any fraudulent misrepresentation. It is true that the orders are not there described as "consignment orders." Copies of the confirmations of these orders, containing the name and address of the customer, the date of his order, and the quantity of products ordered, were annexed, and it may be said of these that they did not disclose upon their face the fact that the orders were consignment orders. But one of the affidavits stated:

"The original orders which were confirmed by the attached copies are on file at our office and were examined by the investigating officers at the time of their inspection."

The original orders disclose the exact situation, and the fact of inspection is confirmed by the agents' report above referred to. I find no evidence to support the conclusion that the permittee misrepresented the nature of these consignment orders. There was no deceit practiced, and I think the only possible conclusion from the evidence is that the nature of the orders was very fully presented, discussed, and considered, and deliberate decision reached by the department that, because of the uncertainty that the consignees would be able to sell the goods to be delivered on consignment, the allowance requested should be cut down.

[6] The third ground is stated as follows:

"(3) That respondent's books accounted for the shipment of various amounts of products in the manufacture of which intoxicating liquor was used, which shipments were made to concerns in foreign countries, whereas in truth such orders were never made."

During the course of an inspection of the plaintiff's records conducted by the prohibition agents, the plaintiff was requested to produce its record of foreign sales, and in response to this request furnished the agents with a number of invoices which purported to cover export shipments. Bills of lading were also furnished covering most of these shipments, but in seven instances the bills of lading were missing. The agents thereupon made inquiries of the officers of the permittee, who were unable to advise them what had become of the bills of lading, but made search for them, which was unsuccessful, and thereafter stated that it was possible that the bills of lading might have been sent to their representatives abroad. Examination of the records in the custom house disclosed that these shipments were not made, and upon this record the charge was made that the permittee had attempted to account for alcohol, whisky, and wine used in the manufacture of products falsely represented to have been shipped to the purchasers named in the invoices.

[7] At the administrative hearing the testimony of the agents was accepted as credible, while that adduced by the permittee was rejected as incredible, and, upon this proceeding to review, the findings regarding the credibility of the witnesses should not be disturbed. If it appeared from the testimony of the agents that the permittee carried these transactions upon its records for the purpose of showing the actual disposition of its manufactured product, there could be no hesitation in sustaining the revocation. The agents made no inquiry for any permanent sales record, and so far as appears did not check the entries regarding these transactions on the books of the plaintiff. They based their calculations upon the reports made to the department under oath, and found an insignificant shortage which was disregarded as unimportant by the trier of the facts. Apparently no attempt was

made to ascertain whether these reports included the invoices in question, nor is there anything to show that the sales were not canceled, as the permittee claims, before shipment, and the cancellation properly reflected in the plaintiff's records.

[8] Careful consideration of the agents' testimony discloses a state of facts entirely consistent with honesty and fair dealing, and is indicative of nothing more than imperfection in its filing system. It is not ground for revoking a permit that papers are not found in their proper files, or that notations are not made on every invoice that the transaction has been canceled, if that be the fact. To sustain a charge of fraudulent misrepresentation in accounting for the disposition of its products,\ the proof should have been carried far enough to show that the canceled invoices were intentionally placed in the files in order to create a false impression, or that the transactions were recorded as completed sales, when in fact they had been canceled. In this respect the testimony under review is utterly lacking.

The Board of Review, in affirming the decision of the trier of the facts, stated "that upon inquiry concerning the missing bills of lading the agents were told that the reason there were no such bills of lading was due to the fact that the bills of lading had been forwarded through a bank to South America and that the respondent had no copies on hand." The evidence was that, when inquiries were made, the agents were told a search would be made for the missing documents, that possibly they were at another office of the permittee, and that after search was made they were informed that the bills of lading had not been located, but that possibly they might have been forwarded to South America. There was no positive statement, and the agents' testimony is only susceptible of the interpretation that the documents were missing, that an effort was made to find them, which was unsuccessful, and that then it was stated that possibly the documents might have gone forward to South America.

The Board of Review concluded its discussion of this charge with a statement to the effect that, "by granting the elimination of these invoices from the record of sales due to the cancellation, a large deficiency of manufactured product then remains unaccounted for." For reasons already pointed out, there is no evidence in the record to support any such finding. The total sales covered by all of the invoices produced were not, so far as appears, checked against any of the other records of the permittee, or its reports to the department, and there is no evidence that the canceled invoices were in any way used by the permittee to account for the disposition of its manufactured product, unless such use is to be inferred from their presence in an office file. That fact alone was quite insufficient to support a finding of deliberate fraud, which this charge involves.

[9] The fourth and fifth grounds upon which the permit was revoked were stated as follows:

"(4) That respondent illegally manufactured Aromatic Elixir under the Regulations, and intoxicating liquor fit for beverage use, and made no report of same on form 1421 as required by the regulations."

"(5) That there was diversion on the part of respondent of 485.5 gallons of alcohol, which respondent reported as being used in the manufacture of its product Fosfosan."

The fourth and fifth charges sustained by the Board of Review are based upon the testimony of a prohibition agent that the records of the plaintiff showed the manufacture of 1,310.5 gallons of Fosfosan with 485.5 gallons of alcohol, and the use of 142.92 gallons of alcohol in the manufacture of Aromatic Elixir. The plaintiff was authorized to use Aromatic Elixir only as an ingredient in manufacturing its product Fosfosan. From these figures it can be shown by mathematical computation that the alcohol consumed was very largely in excess of what was necessary to produce the quantity of Fosfosan shown to have been produced upon the plaintiff's records, and if the figures were correct the charge would be sustained.

Both the trier of the facts and the Board of Review accepted the figures as correct. In this they were clearly in error, because examination of the records in evidence discloses that the figures given by the agent were entirely wrong. The manufacturing record shows that, instead of using 485.5 gallons of alcohol in manufacturing Fosfosan, the plaintiff used 361.87 gallons, and the record further discloses that, instead of producing 1,310.5 gallons of Fosfosan, as the agent testified, the plaintiff produced something in excess of 2,000 gallons of Fosfosan. Under these circumstances the testimony of the agent was worthless. Reference should have been had to the record before accepting his erroneous statements as to what it contained.

[10] The sixth charge is stated as follows:

"(6) That respondent made false records as to use of specially denatured alcohol in

that such specially denatured alcohol was used in the manufacture of products sold to [three concerns, naming them], all located in New York City, inasmuch, as if any of these shipments were made, the same were done in collusion, for the purpose of diversion of the alcohol."

So far as the evidence discloses, these sales were made as recorded, so that there were no false records of any sale. The theory upon which the charge was sustained by the trier of the facts and the Board of Review was that the three companies to whom the products were sold were believed to be engaged in the diversion of denatured alcohol for beverage purposes. The Board of Review stated its position as follows:

"Respondent does not attempt to make any brief for these three concerns and the government through its investigations in connection with the present case, and both prior and subsequent to the time when the respondent was investigated, has determined that these companies are nothing more than cover houses and are connected with the illegal diversion of denatured alcohol; yet practically the entire amount of denatured alcohol withdrawn by the respondent since January 1, 1927, found its way according to the respondent's own books to one or all of these three companies."

[11] There is no evidence that the plaintiff was aware that any of its purchasers were diverting their products to unlawful purposes, nor is there anything but suspicion disclosed by the record that any such diversions were made. When the permittee was notified that the department doubted the honesty of its customers, it terminated all of its transactions with them. The powers of administrative tribunals in rendering decisions vitally affecting individual rights are indeed broad, but it should not be necessary to say that such tribunals are authorized to determine facts only upon evidence formally presented and incorporated in the record of their proceedings.

Further comment upon the record in this case is unnecessary. The plaintiff has been seriously wronged by a decision of administrative officers, which cannot be reconciled with the exercise of that fair and impartial hearing and consideration which the law demands in all such proceedings. The charges find no support in the evidence, and the plaintiff is entitled to have its permit reinstated.

A decree appropriate to this end may be entered.